IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHIRLEY OGDEN,                    :
                                 :
            Plaintiff            :        4:CV-00-272
                                 :        (Judge McClure)
      v.                         :
                                 :
KEYSTONE RESIDENCE,              :
PAMELA COVERT, JOE BERGAN,       :
DOTTIE SERANA, and MICHAEL       :
POWANDA,                         :
                                 :
            Defendants           :

FILED
WILLIAMSPORT, PA

OCT 1 0 2002

MARY E. D'ANDREA, CLERK
Per_____
            Deputy Clerk

## MEMORANDUM

October 10, 2002

**BACKGROUND:**

This is an employment discrimination case.  Before the court are four

motions: three motions for summary judgment and a motion for reconsideration of

a prior order.  The motions for summary judgment will be granted, and the motion

for reconsideration will be denied.

Plaintiff Shirley Ogden is a former employee of Keystone Residence

(Keystone), an agency that provides assistance to persons who are experiencing

mental illness or mental retardation.  She has brought a multitude of claims against

both Keystone as a corporate entity and Keystone employees Pamela Covert, Joe

Bergen (incorrectly spelled in the caption), Dottie Serina (incorrectly spelled in the caption), and Michael Powanda. Her claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; 42 U.S.C. § 1981; the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 et seq.; and the state-law tort of intentional infliction of emotional distress. We have federal question jurisdiction over the Title VII and § 1981 claims. See 28 U.S.C. § 1331. We have supplemental jurisdiction over the PHRA claims and the claims for intentional infliction of emotional distress. See 28 U.S.C. § 1367.

Motions for summary judgment have been filed by Keystone and each individual defendant. Each motion will be granted because with respect to each of her claims, Ogden has failed to produce sufficient evidence such that a reasonable jury could rule in her favor.

We note that in the event of the dismissal of all claims over which we have federal question jurisdiction (which in this case consist of the Title VII and § 1981 claims), we have the option to decline to exercise jurisdiction over the state-law claims (which in this case consist of the PHRA claims and the claims for intentional infliction of emotional distress). See 28 U.S.C. § 1367(c)(3). In this case, though, because each claim is so clearly baseless, we will exercise jurisdiction over the state claims and dismiss them on the merits.

2

The motion for reconsideration, which is based on the court's denial of Ogden's request to use alternative means to record two depositions, will be denied because she has not met the stringent standard necessary for a court to grant her relief.

## DISCUSSION:

### *Motions for Summary Judgment*

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "It can discharge that burden by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Once the moving party points to evidence demonstrating that no issue of

material fact exists, the non-moving party has the duty to set forth specific facts

showing that a genuine issue of material fact exists and that a reasonable factfinder

could rule in its favor.  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 252 (3d

Cir. 1999) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587 (1986)).  "Speculation and conclusory allegations do not satisfy this

duty."  Ridgewood, 172 F.3d at 252 (citing Groman v. Township of Manalapan,

47 F.3d 628, 637 (3d Cir. 1995)).

## II.  STATEMENT OF FACTS

Keystone is a nonprofit human services agency that provides assistance to

persons who are experiencing mental illness or mental retardation.  It owns and

manages group homes in which it provides residents with daily living assistance

services.

Keystone hired Ogden in December 1997.  She was hired as a Community

Support Associate (CSA) in a Keystone facility located on Hudson Street in

Harrisburg, Pennsylvania.  The home was designated as the "Hudson Street

Program."  Ogden's initial rate of pay was $7.00 per hour, and she remained in the

Hudson Street Program throughout her employment with Keystone.

When Ogden began her employment, Keystone provided her with a two-

week-long initial orientation, which included training on Keystone's personnel policies. From December 1997 to June 1998, her immediate supervisor was Pamela Covert, Keystone's Program Director.

As Program Director, Covert reported to the Service Area Director, who at that time was Joseph Bergen. Unlike the Program Directors, who had the responsibility of overseeing a single Program, the Service Area Director had responsibility over several different Programs. Bergen had responsibility over Keystone's Hudson Street Program and other facilities.

Bergen reported to Michael Powanda, Keystone's executive director. Powanda was responsible for the overall management of Keystone's operations. During her employment with Keystone, Ogden spoke with Powanda on only two occasions (during lunch with new employees and exchange of pleasantries while passing in the hallway).

Dottie Serina is Keystone's Director of Human Resources. Serina is responsible for all aspects of human resources for Keystone in Dauphin and Cumberland counties. Wendy Deibert reports to Serina and occupies the position of recruiter.

On September 17, 1998, Ogden met with Bergen and Serina regarding her rate of pay. According to Ogden, her pay was not commensurate with the type of

5

work that she was doing. She pointed out that she was doing hazardous work, such as working with a resident who had a communicable disease and tending to a resident who was physically aggressive. She cited a coworker, Bernard Melbaum, who was doing the same type of work but was being paid more money than she was receiving. According to Ogden, Melbaum told her that she should have been receiving a pay increase that was commensurate with her "hazardous duty."

Ogden complained to Keystone management about her rate of pay. Bergen and Serina told her that her pay rate was established not by the type of work being done but by a particular program's funding. They offered her the opportunity to transfer to a program that paid more than Hudson Street. She rejected this offer, and she elected to remain at the Hudson Street Program.

According to Ogden, she was denied training on various occasions and holiday pay on others.

Throughout Ogden's employment, Bergen made some sexually-themed comments in Ogden's presence. Twice he told her that he was gay. He asked her to set him up with Pete Thompson, a Keystone employee whom Ogden knew.

On one occasion, Bergen commented on the appearance of an employee named Mike, who appeared to look sad. Bergen stated to Ogden that "that's what the fuck he gets for being straight; he should be gay like me and he wouldn't have

6

problems with bitches." On another occasion, Bergen told her that a white male was interested in him. He then stated that he preferred black men.

Bergen made other comments. He stated that he "love[d] niggers." He remarked that he was a "better bitch" than she was and that he could please black men better than she could. He said that he "love[d] black dick." Ogden cannot recall or estimate how many times he made these remarks or recall the specific details of any of these discussions.

From November 24, 1998 until February 9, 1999, Ogden took a leave of absence from work. During this leave of absence, Bergen did not harass her. When she returned to work, Bergen made similar comments.

Ogden believes that Bergen's comments were made on the basis of her race or sex. The following quote from Ogden's deposition details the reasons for this belief:

> Joe had a problem with me because I was a black female and, in my opinion, that is something that I guess he wanted to be since he would talk to me about how he could be a better bitch than me and he could please black men better than me and all these things. He was comparing me to him. And I took it like he wanted to – he liked black men and, like, maybe black women are a threat to him, I don't know, or maybe he just has a thing because he wants to be one. I don't know, I don't know what his reasons are. I can only opinionate (sic) on trying to piece together the different things that he said to me. Why he would do that to me and what other people at Keystone has said that he said to them, the similar things, why he would do that to them and me is because I guess we were black.

(Ogden Dep., Rec. Doc. No. 29, at 257.; Plaintiff's Counterstatement of Material Facts, Rec. Doc. No. 36, at ¶ 24.)

Bergen never touched Ogden nor made any unwelcome physical contact with her. Moreover, he never exposed himself to her.

Throughout the course of her employment, Ogden submitted to Keystone a number of letters that raised complaints regarding her work situation. The complaints included, among other things, issues relating to resident health, a resident's inappropriate behavior, and complaints regarding her own pay increase. None of these letters touched on sexual harassment.

On or around June 4, 1999, Ogden wrote a letter to Powanda in which she outlined certain grievances she had with Keystone. The complaints included (1) the living conditions of residents in her program; (2) drug activity and criminal activity in the neighborhood; (3) loose dogs; (4) excessive noise; (5) flooding basements; (6) deficient food budgets; (7) insufficient staffing levels; (8) insufficient supplies; (9) peeling paint; (10) lack of leg room in the Keystone automobile; and (11) low-quality windows. The letter lacked any reference to Bergen's comments or any other harassment.

On June 7, 1999, based on her psychiatrist's recommendation, Ogden resigned from employment.

Keystone provides its employees with a written anti-harassment policy entitled "Discrimination Complaint Procedure." (Ogden Dep. Exhibit 12,, Rec. Doc. No. 29.) The policy states that in the event an employee believes that he or she is being discriminated against on the basis of her race or gender, he or she may contact Keystone's Human Resource Specialist. At that point, the Human Resource Specialist may conduct an investigation into the allegations. Although Ogden does not recall receiving or being informed of an anti-harassment policy, she signed a verification form that indicated her receipt of Keystone's Personnel Guidelines, which referenced the Discrimination Complaint Procedure. Her signature indicated that she had read, understood, and acknowledged that as a condition of her employment, she was required to comply with Keystone's personnel policies and procedures.

Ogden never contacted Serina, the Human Resource Specialist, about Bergen's harassment. She did complain to other employees in her direct chain of command, Porscha Summers and Michael Gibson. She asked them how to report harassment allegations, and they told her to contact Powanda. According to Ogden, she tried to contact Powanda but Powanda never made the time to see her. She claims that she was referred back to Bergen himself.

9

### III. CLAIMS

Ogden's presentation of her claims is bewildering and virtually unintelligible. Her claims are not sufficiently delineated, and both her complaint and her single response to the three motions for summary judgment are unclear as to which claim is against which defendant. Thus, it is left to the court to decipher Ogden's submissions.

It is apparent that the defendants in the action are Keystone as a corporate entity and Covert, Bergen, Serina, and Powanda individually. Against Keystone, Ogden asserts claims under § 1981, Title VII, and the PHRA for hostile work environment (based on Bergen's conduct) and disparate treatment (based primarily on her undesirable pay rate). She also raised a claim of intentional infliction of emotional distress based on the aggregate of this conduct. Against Bergen, she brings claims under § 1981, Title VII, and the PHRA for hostile work environment and a state-law claim of intentional infliction of emotional distress. Against Covert, Serina, and Powanda, she raises claims under § 1981, Title VII, and the PHRA for hostile work environment and disparate treatment (both claims being based on the facts applicable to the corresponding claims against Keystone) and a state-law claim of intentional infliction of emotional distress.

# IV. ANALYSIS

We note at the outset that employer liability under the PHRA follows the standards set out for employer liability under Title VII. See Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000) (citing Jones v. School District of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999)). The standards of proof for a section 1981 case are likewise identical to the standards of proof for a Title VII case. See Lewis v. University of Pittsburgh, 725 F.2d 910, 915 n. 5 (3d Cir. 1983); Bullock v. Children's Hosp. of Philadelphia, 71 F. Supp. 2d 482, 485 (E.D. Pa. 1999).

## A. Claims Against Keystone

Ogden asserts claims against Keystone under § 1981, Title VII, the PHRA, and the state-law theory of intentional infliction of emotional distress. It is undisputed that Keystone is a proper defendant under each of these theories. Ogden asserts the following claims: (1) Bergen's statements, which were based on Ogden's race, gender, or both, created a hostile work environment; (2) Keystone's differential treatment of Ogden, i.e. paying her less than a white male coworker and denying her training and holiday pay, was discriminatory and based on her race, gender, or both; and (3) the above-mentioned harassment and differential

11

treatment creates a factual question as to whether Keystone subjected Ogden to intentional infliction of emotional distress.

## 1. Hostile Work Environment

The Third Circuit has held that to succeed on a claim for hostile work environment, a plaintiff must prove that: (1) the plaintiff suffered intentional discrimination because of her sex or race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex or race in that position; and (5) the existence of respondeat superior liability. <u>Kunin v. Sears Roebuck and Co.</u>, 175 F.3d 289, 293 (3d Cir. 1999); <u>see also</u> <u>Abramson v. William Patterson College of New Jersey</u>, 260 F.3d 265, 276-77 (3d Cir. 2001). In determining the existence of a hostile work environment, the totality of the circumstances must be examined. <u>Cardenas v. Massey</u>, 269 F.3d 251, 260 (3d Cir. 2001).

### 1(a). Intentional Discrimination Because of Sex or Race

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex [or

12

race].'" <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 81 (1998).

"The critical issue, Title VII's text indicates, is whether members of one sex [or

race] are exposed to disadvantageous terms or conditions of employment to which

members of the other sex [or race] are not exposed." <u>Id.</u> at 80 (quoting <u>Harris v.</u>

<u>Forklift Systems, Inc.</u>, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)).

     Sexual harassment in particular can take different forms, both overtly sexual

and facially neutral.  "The intent to discriminate on the basis of sex in cases

involving sexual propositions, innuendo, pornographic materials, or sexual

derogatory language is implicit, and thus should be recognized as a matter of

course.  A more fact intensive analysis will be necessary where the actions are not

sexual by their very nature." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469,

1482 n.3 (3d Cir. 1990).  "To constitute impermissible discrimination, the

offensive conduct is not necessarily required to include sexual overtones in every

instance . . . ." <u>Id.</u> at 1485.  "All that is required is a showing that [gender] is a

substantial factor in the harassment, and that if the plaintiff had been [male] she

would not have been treated in the same manner." <u>Aman v. Cort Furniture Rental</u>

<u>Corp.</u>, 85 F.3d 1074, 1083 (3d Cir. 1996); <u>see also</u> <u>Cardenas</u>, 269 F.3d at 261;

<u>Durham Life Ins. Co. v. Evans</u>, 166 F.3d 139, 148 (3d Cir. 1999).

13

The same principle applies to racial harassment. That is, in order to constitute racial harassment, the subject behavior need not be overtly "racial" in nature. Aman, 85 F.3d at 1083. As the Third Circuit has stated in the context of racial harassment, "there are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination." Id. "The words themselves," noted the court, "are only relevant for what they reveal – the intent of the speaker." Id.

Although the evidence supporting this prong is marginal, we will give Ogden the benefit of the doubt and find that the prong is fulfilled. Bergen's comments insinuating that he could please black men better than Ogden could are sufficient to demonstrate that Ogden's comments were based on either her sex, her race, or both.

### 1(b).  Pervasive and Regular

"[H]arassment is pervasive when 'incidents of harassment occur either in concert or with regularity.'" Andrews, 895 F.2d at 1484 (quoting Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987)). The Third Circuit has pointed out that its "pervasive and regular" standard seems to differ from the Supreme

14

Court's requirement, defined in <u>Harris</u> and later in <u>Oncale</u>, that the harassment be "severe or pervasive."  To date, though, the Third Circuit has not resolved this apparent discrepancy.  <u>See, e.g.</u>, <u>Abramson</u>, 260 F.3d at 277 n.6 (contrasting the Third Circuit's language with the terms set forth by the Supreme Court).

In any event, both the Supreme Court and the Third Circuit have held that "'simple teasing, offhand comments, and [non-serious] isolated incidents'" do not "'amount to discriminatory changes in the terms and conditions of employment'" and therefore are insufficient to establish an issue of material fact on this prong. <u>Abramson</u>, 260 F.3d at 280 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1999)).

The complained-of conduct in the instant case consists of only the type of "offhand comments and non-serious isolated incidents" that the appellate courts have found to be unactionable.  While Bergen may have used inappropriate language in describing his preference for black men, Ogden cannot cite the frequency of these comments.  The record contains no indication that Bergen's behavior could be characterized as constant or even frequent.  Accordingly, a jury could not reasonably find that Bergen's harassment was pervasive and regular.

Further, the harassment fails to satisfy the Supreme Court's "severe or

15

pervasive" standard.  As stated, the conduct was not pervasive.  Neither was it severe.  Bergen's comments regarded primarily his own sexual preferences and had relatively little to do with Ogden herself.  Bergen never touched Ogden, and he never propositioned her for a relationship.  There is no indication that he was attempting to belittle or demean her.

Bergen's conduct was neither pervasive, regular, nor severe; the lack of evidence to satisfy this prong renders Ogden's claim meritless.

### 1(c).  Subjective element

The harassment plaintiff must find the harassment to be abusive.  "[I]f the [harassment] victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  Harris, 510 U.S. at 21-22.  Implicit in this prong is that a harasser's sexual advances or racial harassment must be unwelcome to the plaintiff.  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986).  Actual economic harm, however, is not a prerequisite to an employee's job conditions being altered in violation of Title VII.  Harris, 510 U.S. at 21.

Psychological harm likewise is not required.  "Title VII comes into play

16

before the harassing conduct leads to a nervous breakdown.  A discriminatorily
abusive work environment, even one that does not seriously affect employees'
psychological well-being, can and often will detract from employees' job
performance, discourage employees from remaining on the job, or keep them from
advancing in their careers."  Id. at 22.  "The effect on the employee's
psychological well-being is, of course, relevant to determining whether the
plaintiff actually found the environment abusive.  But while psychological harm,
like any other relevant factor, may be taken into account, no single factor is
required."  Id.

Ogden's counterstatement of material facts suggests that her psychiatric
treatment focused in part on "harassment at work."  (Counterstatement of Material
Facts at ¶ 62.)   A specific citation to admissible evidence, however, is lacking.
Nevertheless, we will assume without deciding that Ogden meets this prong.


### 1(d). Objective element

"Conduct that is not severe or pervasive enough to create an objectively
hostile or abusive work environment – an environment that a reasonable person
would find hostile or abusive – is beyond Title VII's purview."  Harris, 510 U.S. at

17

21. "In determining whether the fourth prong, the objective test, is met, we must look[ ] at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Abramson, 260 F.3d at 280 (quoting Harris, 510 U.S. at 23) (internal quotation marks omitted).

Ogden has not adduced evidence sufficient to satisfy this prong. As stated above, Bergen's comments regarded primarily his own sexual preferences and had relatively little to do with Ogden herself. Bergen never touched or even physically threatened Ogden, and he never propositioned her for a relationship. There is no indication that he was belittling Ogden for being a woman or for being black. That she cannot quantify the frequency of Bergen's comments weighs against her fulfillment of this prong. Finally – and perhaps most importantly – there is no evidence that Bergen's comments unreasonably interfered with Ogden's work performance. Because Bergen's behavior was not of the type that would have detrimentally affected a reasonable person of the same sex or race in Ogden's position, the "objective test" is not met, and Ogden's claim fails.

18

1(e).  Respondeat Superior Liability

The final element in a successful Title VII claim for hostile work environment is respondeat superior liability.  "An employer is not always liable for a hostile work environment."  Kunin, 175 F.3d at 293.  Employer liability depends upon whether the person charged with creating the hostile environment is the plaintiff's supervisor or merely the plaintiff's coworker.  While neither the Supreme Court nor the Third Circuit has explicitly defined "supervisor" in this context, Faragher noted that the power to supervise includes the authority "to hire and fire, and to set work schedules and pay rates."  Faragher, 524 U.S. at 803.

"[S]ex-based mistreatment by a supervisor – whether overtly sexual or facially neutral and whether motivated by lust or dislike – creates automatic liability when it rises to the level of a tangible adverse employment action."  Durham Life Ins., 166 F.3d at 152 (citing Faragher, 524 U.S. at 775).

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Cardenas, 269 F.3d at 267 n.10 (citation and internal quotation marks omitted).  "Although direct economic harm is an important indicator of a tangible

19

adverse employment action, it is not the sine qua non.  If an employer's act

substantially decreases an employee's earning potential and causes significant

disruption in his or her working conditions, a tangible . . . employment action may

be found." <u>Durham Life Ins.</u>, 166 F.3d at 153.

The EEOC Guidance Manual links the terms "supervisor" and "tangible

employment decisions" by stating that an individual qualifies as a supervisor if he

has the authority to undertake or recommend tangible employment decisions

affecting the employee.  <u>Vicarious Employer Liability for Unlawful Harassment</u>

<u>by Supervisors</u> (June 18, 1999), EEOC Compliance Manual (BNA) N:4075

(Binder 3); (http://www.eeoc.gov/docs/harassment.html).

When the harasser is a supervisor who takes no tangible employment action,

the employer may raise an affirmative defense to liability or damages, subject to

proof by a preponderance of the evidence.  <u>Faragher</u>, 524 U.S. at 807.  "The

defense comprises two necessary elements: (a) that the employer exercised

reasonable care to prevent and correct promptly any sexually harassing behavior;

and (b) that the plaintiff employee unreasonably failed to take advantage of any

preventive or corrective opportunities provided by the employer or to avoid harm

otherwise." <u>Faragher</u>, 524 U.S. at 807 (citation omitted).

20

"While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." Id. at 807-808.

To summarize, if a supervisor's harassment results in a tangible employment action, the employer is liable. If the supervisor does not take a tangible employment action yet still harasses the plaintiff, the employer may use the affirmative defense. A demonstration that a plaintiff unreasonably failed to complain of harassment despite an established complaint policy will generally satisfy the employer's burden.

The parties agree that Bergen was Ogden's supervisor. Ogden alleges without factual support that Bergen's conduct resulted in a constructive discharge (and therefore a tangible employment action that gives rise to automatic liability).

21

"To establish a [successful] constructive discharge claim, [a] plaintiff must establish that the employer knowingly permitted conditions of discrimination in employment 'so intolerable that a reasonable person would be forced to resign.'" Stewart v. Weis Markets, Inc., 890 F. Supp. 382, 391 (M.D. Pa. 1995) (quoting Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1232 (3d Cir. 1988)). A viable constructive discharge claim requires "more than subjective perceptions of unfairness or harshness or a stress-filled work environment." Id. (citing Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir.1992); Clowes v. Allegheny Valley Hospital, 991 F.2d 1159 (3d Cir. 1993)). Ogden's brief contains nothing more than her unsubstantiated opinion that Bergen's behavior caused her to be "driven away." (Plaintiff's Brief, Rec. Doc. No. 35, at 13.) Based on well-established law, her claim of constructive discharge is meritless. Accordingly, Keystone is free to raise the affirmative defense to employer liability.

In order for Keystone to prevail in its affirmative defense, it must show that despite having access to an established complaint procedure, Ogden unreasonably failed to complain of Bergen's harassment. The undisputed facts show this to be the case. Keystone employed an anti-harassment policy that allowed employees to report harassment to a Keystone Human Resources Specialist. Upon hearing a

22

complaint from an employee, the Human Resource Specialist had the authority to launch an investigation into the allegations. Ogden signed a document indicating that she was aware of the anti-harassment procedures, but she failed to utilize the complaint process. She did not complain to Serina, who was a Human Resource Specialist, and she gives no satisfactory reason for this omission. Under Supreme Court case law, these facts alone allow Keystone to prevail on the affirmative defense. We also note more of Ogden's omissions. While she may have mentioned Bergen's conduct to her immediate supervisors, she did not ask them to follow up on her complaints. Finally, she made no colorable effort to report Bergen's conduct to Powanda, the Keystone Executive Director. While she claims that Powanda made no time for her, she herself found the time to write Powanda a long letter shortly before her resignation; this letter made no mention any workplace harassment. Thus, not only did she fail to follow Keystone's complaint procedure, but she also failed to bring Bergen's conduct to Keystone's head officer. These facts show that the fifth prong of Ogden's claim cannot be satisfied.

We summarize our decision regarding the claim for hostile work environment claim. Summary judgment on this claim is warranted because Ogden

23

fails to fulfill three out of the five elements of the claim. That is, there is no evidence that Bergen's conduct was based on her race or sex, there is no evidence that a reasonable person would be detrimentally affected by Bergen's alleged harassment, and employer liability is lacking. For any of these three reasons, the claim fails.

### 2. Disparate Treatment

Ogden contends that Keystone subjected her to discriminatory treatment. Specifically, she seems to complain that (1) she received pay lower than a white male doing the same job; (2) she was improperly denied certain training; and (3) she was improperly denied holiday pay.

The analysis of a disparate treatment claim under Title VII proceeds in three stages. See Jones v. School District of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas Corp v. Green, 411 U.S. 792, 802-804 (1973)). First, the plaintiff must establish a prima facie case of discrimination. Id. Second, if the plaintiff produces sufficient evidence to establish a prima facie case, the defendant has the burden to come forth with a legitimate, non-discriminatory reason for its actions against the plaintiff. Id. (citation omitted). Third, if the defendant satisfies this burden, the plaintiff must provide sufficient evidence that

the proffered reason is pretextual.  Id. (citation omitted).

In order to make out a prima facie case of race or gender discrimination, a
Title VII plaintiff must prove that: (1) she is a member of a protected class; (2) she
suffered some form of adverse employment action; and (3) this action occurred
under circumstances that give rise to an inference of unlawful discrimination; an
example of these circumstances may be found when a similarly situated person
outside of the protected class is treated differently from the plaintiff.  Boykins v.
Lucent Techs., Inc., 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000) (citing Jones v. Sch.
Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)); see also Goosby v. Johnson &
Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000).

Ogden's assertions relating to the denial of training and the denial of
holiday pay may be rejected quickly.  The denial of training was not an "adverse
employment action."  An adverse employment action "constitutes a significant
change in employment status, such as hiring, firing, failing to promote,
reassignment with significantly different responsibilities, or a decision causing a
significant change in benefits.'"  Cardenas, 269 F.3d at 267 n. 10 (citation and
internal quotation marks omitted).  Ogden provides no evidence that a denial of
training fits this definition.  As for the denial of holiday pay, Ogden fails to show

that this denial had anything to do with her race or gender.

The sole remaining argument is Ogden's assertion that she was discriminatorily denied "hazardous duty pay." Her only evidence that she was illegally denied this pay is that Melbaum was being paid more money than she was while the two of them were both doing "hazardous duty." She claims that the fact that a white male was being paid more for doing the same work is evidence of discrimination.

It is well-established that "a plaintiff may . . . show pretext on a theory of disparate treatment by providing evidence that [she] was treated differently from other similarly-situated . . . employees . . . ." Kendrick v. Penskie Transportation Services, Inc., 220 F.3d 1220, 1232 (10th Cir. 2000). If the employee referenced by the plaintiff was not similarly situated to the plaintiff, pretext cannot be inferred, and the plaintiff's claim fails. See Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 359 (1999); Kendrick, 220 F.3d at 1232; Morris v. G.E. Financial Assurance Holdings, No. 00-3849, 2001 WL 1558039, at *6-*8 (E.D. Pa. December 3, 2001) (citations and internal quotation marks omitted).  Showing that an employee is similarly situated is no easy task: "In order for employees to be deemed similarly situated, it has been determined that the individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same

26

supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Morris</u>, 2001 WL 1558039, at *6 (citations and internal quotation marks omitted).

Ogden cannot show that Melbaum was a similarly situated employee. She admits that she has no knowledge of the Program to which Melbaum was assigned, and that she is unaware of Melbaum's experience in the mental health field. There is no indication that Melbaum dealt with the same supervisor to whom Ogden reported or was subject to the same set of standards as Ogden. Without evidence that Melbaum was similarly situated to Ogden, Ogden cannot make out a prima facie case of differential treatment. Moreover, we note that the Third Circuit has held that at the prima facie stage of the case, "evidence of differential treatment of 'a single member of the non-protected class is insufficient to give rise to an inference of discrimination.'" <u>Pivirotto</u>, 191 F.3d at 359 (quoting <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 646 (3d Cir. 1998)). Based on Ogden's lack of a prima face case, her claim of differential treatment is meritless.

27

### 3. Intentional Infliction of Emotional Distress

Ogden claims that the aggregate of Keystone's actions amounted to intentional infliction of emotional distress (a Pennsylvania state-law claim). To establish a claim in Pennsylvania for intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998). "Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had [sic] presented only the most egregious conduct." Id. "It is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Id. (quoting Cox v. Keystone Carbon, 861 F.2d 390. 395 (3d Cir. 1998)).

Nothing that Keystone did rose to the level of "the most egregious conduct." Accordingly, summary judgment on this claim is proper.

Moreover, there exists an alternative basis to reject Ogden's claim: the claim is preempted by Pennsylvania's worker's compensation statute,

77 P.S. § 481(a).  The Third Circuit has held that the statute "bars claims for intentional and/or negligent infliction of emotional distress [arising] out of [an] employment relationship."  Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 940 (3d Cir. 1997) (citations and internal quotation marks omitted).  Because Ogden's claim is one for intentional infliction of emotional distress arising out of an employment relationship, it is preempted by the worker's compensation statute.

## B.  Claims Against Bergen

Ogden asserts claims against Bergen individually.  The claims are limited to (1) hostile work environment under § 1981, Title VII, and the PHRA; and (2) intentional infliction of emotional distress.  Each claim is based on the facts applicable to the corresponding claim against Keystone.

### 1.  Hostile Work Environment

Neither Title VII nor the PHRA authorizes liability against an individual supervisor or employee.  Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1078 (3d Cir. 1996) (en banc).  Accordingly, Ogden's Title VII and PHRA

29

claims against Bergen fail. Even had Bergen been a proper defendant under Title VII and the PHRA, Ogden's hostile work environment claim would have failed on the merits for the same reasons that her hostile work environment claim against Keystone fails.

Bergen does not dispute that he is a proper § 1981 defendant. We stated above that when it comes to a claim for hostile work environment, the substantive legal analysis under § 1981 is indistinguishable from that under Title VII. Accordingly, the § 1981 hostile work environment claim against Bergen individually fails for the same reasons that the Title VII hostile work environment claim against Keystone fails, i.e., that Bergen's actions did not create a hostile work environment.

### 2. Intentional Infliction of Emotional Distress

The claim against Bergen for intentional infliction of emotional distress lacks merit. As with the claim against Keystone, it fails because Bergen's behavior – consisting primarily of expressing to Ogden his desire for black men – did not rise to the requisite level of "the most egregious conduct." See Hoy, 720 A.2d at 754.

30

## C.  Claims against Covert, Serina, and Powanda

Ogden asserts claims against Covert, Serina, and Powanda individually.
The claims are limited to (1) hostile work environment under § 1981, Title VII,
and the PHRA; (2) differential treatment under § 1981, Title VII, and the PHRA;
and (3) intentional infliction of emotional distress.


### 1.  Hostile Work Environment

Through her claim for hostile work environment, Ogden seeks to impose
vicarious liability on Covert, Serina, and Powanda.  Specifically, she argues that
Covert, Serina, and Powanda are vicariously liable for Bergen's creation of a
hostile work environment.

Because neither Title VII nor the PHRA authorizes liability against an
individual supervisor or employee, these claims against these defendants must fail.
What remains is Ogden's § 1981 claim.  This claim lacks merit because § 1981
liability is personal in nature and cannot be vicarious.  Boykin v. Bloomsburg
University of Pennsylvania, 893 F. Supp. 400, 406 (M.D. Pa. 1995) (citing Jett v.
Dallas Independent School District, 491 U.S. 701, 735 (1989)), aff'd 91 F.3d 122
(3d Cir. 1996).

31

Even if these defendants could be properly sued under any of these statutes, Ogden's claim would fail because, as stated above, there was no hostile work environment to speak of.

## 2.  Differential Treatment

Ogden asserts that Covert, Serina, and Powanda subjected her to discriminatory treatment.  As with her claim against Keystone, she bases these claims under § 1981, Title VII, and the PHRA.  As with her claim against Keystone, she seems to complain that (1) she received pay lower than a white male doing the same job; (2) she was improperly denied certain training; and (3) she was improperly denied holiday pay.

Because neither Title VII nor the PHRA authorizes liability against an individual supervisor or employee, these claims against these defendants must fail. The § 1981 disparate treatment claim against these defendants is identical to the § 1981 disparate treatment claim against Keystone.  For the same reasons that the differential treatment claim against Keystone fails, i.e., failure to establish a prima face case (see above), the differential treatment claim against these defendants is meritless.

### 3.  Intentional Infliction of Emotional Distress

Each claim against Covert, Serina, and Powanda  for intentional infliction of emotional distress is baseless.  The facts of each claim is based on the facts applicable to the corresponding claim against Keystone.  As with the claim against Keystone, each of these claims fails because these defendants' behavior – which seems to have been completely proper – did not rise to the requisite level of "the most egregious conduct."  See Hoy, 720 A.2d at 754.

### *Motion for Reconsideration*

Ogden asks that we vacate part of an April 19, 2001 order that ruled on Ogden's "motion to compel and for sanctions."  In that motion, Ogden sought a court ruling that would allow her to use an alternative method to record the taking of two depositions.  Ogden did not give defense counsel adequate notice of her wish to use alternative means, and defense counsel refused to allow her to record the depositions.  We denied Ogden's request for permission to record the depositions and her request for sanctions.  Specifically, we cited the fact that Ogden violated Federal Rule of Civil Procedure 30(b)(3)'s requirement that any party wishing to use alternative means to record must provide the other party with

notice.

Ogden now asks that we vacate the part of the April 19, 2001 order that denied her requests. We construe Ogden's request as a motion for reconsideration of the April 19, 2001 order.

"'The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence.'" Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)). "Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." (citing North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)). "A motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." Abu-Jamal v. Horn, No. CIV. A. 99-5089, 2001 WL 1609761, at *9 (E.D. Pa. December 18, 2001) (citations and internal quotation marks omitted).

Ogden's motion for reconsideration contains merely a rehashing of the arguments that she made in her original motion. She cites no change in the law that took place since our issuance of the opinion, she does not bring our attention to any newly discovered evidence, and she does not convince us that our opinion denying her requests contained a clear error of law or would lead to a manifest injustice. The simple fact that Ogden is unhappy with the result of the April 19, 2001 opinion is an insufficient basis to grant her relief.

**CONCLUSION:**

Summary judgment will be granted as to each of Ogden's claims. The claims for hostile work environment, differential treatment, and intentional infliction of emotional distress all fail for lack of sufficient evidence. Further, Ogden's motion for reconsideration of our April 19, 2001 order lacks merit. An appropriate order follows.

James F. McClure, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHIRLEY OGDEN,          :
                             :
          Plaintiff      :        4:CV-00-272
                             :        (Judge McClure)
        v.                :
                             :
KEYSTONE RESIDENCE,    :
PAMELA COVERT, JOE BERGAN, :
DOTTIE SERANA, and MICHAEL  :
POWANDA,             :
                             :
          Defendants   :

FILED
WILLIAMSPORT, PA

OCT 1 0 2002

MARY E. D'A... CLERK
Per _____
Deputy ...

**O R D E R**

October 10, 2002

For the reasons set forth in the accompanying memorandum,

**IT IS ORDERED THAT:**

1.    The motions for summary judgment filed by defendants Keystone,

Bergen, Covert, Serina, and Powanda (Rec. Doc. Nos. 21, 25, and 23) are granted.

2.    The "motion to vacate and reconsider in part its' (sic) order of April

19, 2001 (Rec. Doc. No. 32) is denied.

3.    The clerk is directed to enter judgment in favor of defendants and

against plaintiff.

4.    The clerk is directed to close the case file.

James F. McClure, Jr.
United States District Judge